Good morning, Your Honors. I'm Jeffrey Thomas. I'm the Appellant's Counsel. And I do want to note that I have filed a renewed motion to- We have that. We'll take that under submission and address the merits of the case. Okay. We're here today about a summary judgment that was done in error that was rendered for the appellees. And it's a very complicated case. I know you're familiar with the facts. I thought what I would do to start this off is I would go over the minute order that the district court- We have read- Counsel, just so you understand, we have read the briefs. We have read the opinions of the courts. We have read the exhibits. We prepare these cases. This is not our introduction to the case. So you should use your time to focus on what you consider to be the most important issue, and you don't think it's adequately set forth in your brief. So why don't you use that as a guidepost? Your Honor, I think that, first of all, I think the most important issue is the fact that the facts, the evidence for either side was not construed properly in the district court. It was not weighed properly. Let me see if I can focus on an issue and get to the heart of an issue that does concern me about what the district court did. My understanding is that the time summary judgment was entered, the defense had expert witnesses on medical causation, and you did not. Is that correct? Your Honor, I think that that is half a story. I think that we did not have – there's actually two chains. There are two surgeries. We had the treating physicians to testify that it was more likely than not, I believe, if you look at their testimony, that it was Dr. Wang's surgery that was the cause of the deterioration of the paralysis. That's one – What – this is – I tried – this is a very – your client's in a very sympathetic position, but, of course, we can't decide the case based on sympathy. The law, as I've been educated to understand it in the Ninth Circuit, or that we need to apply to state law, requires that you have admissible evidence from a qualified expert that, to a reasonable degree of medical probability, something Dr. Wang did caused injury, actually paralysis, to Mrs. Moore. Isn't that the – isn't that it, the law? Correct, Your Honor. And it's not sufficient to have evidence that would establish only a mere possibility, correct? You're absolutely correct. So I'd like you to – you know, to zero in on this would be very helpful to me. First, what exactly do you allege Dr. Wang did that was malpractice that caused paralysis? One. And two, then just point me in the record to the best evidence you have that some qualified expert said to a reasonable degree of medical probability that alleged malpractice caused harm to Mrs. Moore. Well, okay. Again, we have the testimony of Dr. Lowerman that – Malpractice was that she was contraindicated for the study. She was at a high risk of infection from the study, and also the study was experimental. This particular medical device expands once it's been applied to the body. That's by design. That's by intent. And there have been some changes in the product throughout the – Okay, so I think you say she was not eligible for the Duracell study, correct? She was not, Your Honor. And then do you contend that the Duracell glue that was used caused the infection and the paralysis? She got it. All right. Now, which of the experts that you offered says that that alleged malpractice, to a reasonable degree of medical probability, caused the harm, caused the paralysis? Who's the best one? Okay. Dr. Lowerman, for one thing, says that it's contraindicated to put her in study and it's a high risk of infection, okay? He's not saying that. He's not an orthopedic surgeon, so he can't say to a reasonable medical probability this caused her paralysis. He can say to a probability it caused the infection. Now, we also have the Meridia case from the Sixth Circuit. No, I want to know – I want to go right into the evidence. I really, you know, read with particular care what each of these people said. And I was searching to see whether there was something that perhaps wasn't clearly identified in the brief that met the required standard, and I'm hoping you can hone me in on something. Well, that's part of it. And then we also have Dr. Gershwin, who was part of the post-judgment motion to bring in the evidence. I'll revise my question. Before the district judged, because I think Dr. Gershwin would have done it if you had found him, looked for him before the motion for summary judgment. But who before the district judge decided the motion for summary judgment provided your best evidence that the malpractice concerning the Duracell to a reasonable degree of medical probability caused the paralysis? It would be a combination of her treating physicians and Dr. Lauer. The treating physicians are whom? Dr. Nagy and Dr. Delamarda, the subsequent treating physicians. Well, Dr. Nagy was actually straddling Dr. Wang because he treated before Dr. Wang and Dr. Delamarda. Can you point me in the record to what they said that gets you over that hurdle, gets you a triable issue? They addressed basically whether her problems were as a result of Dr. Wang's surgery or something that preexisted Dr. Wang's surgery. Now, we know because of her stay at Desert Shrink Hospital at the end of August that her fusion that she had had for five years, she had lost her fusion. Now, just to give you a little bit of education here,  they take something called BMP, which is bone morphogenic protein. That's what it stands for. The nearest analogy you can think of is when you're small, there's a tree growing in your yard. You leave a can there or something. Fifteen years later, you go back. The tree has fallen down. You open it up, and the tree grows around the can. The bone cage is like a can, and the bone morphogenic protein, if the fusion takes properly, it grows bone around the can, the bone cage, up and down below, and it sort of forms as best as can a natural spine. She had lost her fusion. If you look at the medical records at the end of August, that bone was not there anymore in the bone cage. We don't know why exactly, but Dr. Wang was ready to try again.  Bone quality was decent. He could get a position. He could get a fixation in there. He thought he did a bang-up job. He did a really bang-up job. He has a horrible, horrible, horrible infection, horrible infection, in which there's something about 200 milliliters of fluid taken out just that one morning of his reprieve. As you look at Dr. Talbert's testimony, Dr. Jacob Talbert testifies that he knows, and it's a very common, very accepted scientific fact in orthopedic surgery, that the infection is going to prevent you from fusing. It's going to prevent that BMP from growing. It's going to prevent your hardware from being stabilized, and if your hardware is not stabilized, you're going to be jeopardizing your nerve roots, your spinal cord, you're going to be compromising it. It's going to keep coming back. So those are the experts? Before, before. Those are the before experts. But didn't Dr. Lauerwitz say that he could not draw any causal relationship to reasonable medical probability between Dr. Wang and Ms. Moore's infections? That's on page 200 of the... Sorry. What he said was that he could not draw any sort of conclusion as to the paralysis. I think that's what he said. Right. So that one doesn't meet the nearly standard. I was looking to find one that sort of puts you in the position to get a trial, but if it's Dr. Lauerwitz, he said he can't make that connection. In his opinion, that connection can't be made. He's not a specialist in orthopedic surgery, not a neurosurgeon. We can't have that person who can do everything. Well, you found him after summary judgment was granted against you. Dr. Gershwin is an exceptional witness. He's an exceptional person. My letter apparently got to him. I'd given the wrong fax number. It apparently got to him like a message in a bottle somewhere in Davis Hospital, and he called me out of the blue, and he said, hey, Jeff, do you still need a witness? And I'm like, well, yeah, do you still need a witness? And he called me like 14 days later. I'm sorry, did you say there was something wrong with your initial letter? You described it wrong. Well, the fax, he gave me a fax number. It was like a fax number for the custodial department or something. He goes, I don't know how your letter got to me. And I said, well, I don't know either because. When did you send the letter? After summary judgment was granted? No, it was before. It was like I think it was a few days before. You know, I was very busy at this time. I was doing a stipulation. It's about this thick, I think you've seen it, to try to get some discovery going. Not new discovery, but discovery orders from responses to discovery that we already had. Outstanding. But just as you found your other experts, you could have found Dr. Gershwin earlier. You know, before you filed the summary judgment papers, you just didn't. We had a problem because I would talk to people, and I would talk to, I'd call them out of the blue. I'd call somebody I knew who was associated with another doctor, and they'd say, I don't use the product. I can't help you. And this is, I want to point this out, too. You know, I looked at this in the minute order today, and it's the first time I've ever seen it. He cites Dr. Hawley's declaration, and Dr. Hawley's declaration says, he opines that Wang's use of the Duracell sealant was reasonable and met the standard of care. Well, I don't know that Dr. Hawley uses the Duracell sealant. Young, but that's a two-minute order. You know, why is he testifying to it? It's an experimental product. He's not an investigator. I mean, it's an error. Why don't you save the rest of your time for a rebuttal, so that you can respond to what the other people... Well, I mean, I hope that I can help you somehow. I'll be glad to sit down. You'll have a couple of minutes after your... I mean, I can talk as long as you're willing to. Sure. Thank you. Good morning, Your Honor. Dawn Cushman for Dr. Wang, and I'll be taking the laboring oar, and then if you have specific questions with regard to USC or Confluent, they're also available to... Here's my question. If the Gershwin evidence affidavit declaration had been available for Judge Anderson's consideration in connection with summary judgment, would this be a different case? Absolutely not. Tell us why. There is nothing about Dr. Gershwin's declaration that's admissible in any manner or form. It's nothing but conclusion after conclusion. And as a matter of fact, in all of the cases, and we've cited them in the briefs, should say that, and particularly under California law, for example, I know I've cited Bushling. The Bushling decision talks about how an expert opinion that is conclusory is worthless, that it has to be based on facts, and the facts have to be set forth in the declaration. And so, for example, we have Dr. Gershwin stating the use of spinal sealant was a direct contributor to the neurological complications, including infections. There is nothing within his declaration that provides the factual basis for him to reach that conclusion. Even the cases such as Contreras recognize that you need an expert explaining how an infection results, and we already had Dr. Hawley's declaration saying that infections occur even in the absence of negligent care. So how is the use of the sealant causing an infection, according to Dr. Gershwin? Your position in this appeal is, I take it, that it was an error for the district court to not reconsider summary judgment. But even if there was an error in not considering the Gershwin evidence information, it's harmless in any event because that declaration does not meet snuff in terms of providing medical certain testimony as to causation. That's correct. So it's okay for this panel to look directly at what Gershwin said in assessing whether summary judgment should be granted. Well, I would hope that this panel would go through the machinations of getting there because I don't think anything was done correctly to get to that point. It's an even-if argument. It's an even-if argument. There is no prejudicial error because Dr. Gershwin's testimony was inadmissible. One of the things that I'm scratching my head a bit about is, at some point in time did plaintiff move to compel the disclosure of information from the hospital? And was that motion unresolved at the time of summary judgment or its reconsideration? Not that I'm aware of. As to the hospital, I know that there were two attempts by plaintiffs to file motions to compel discovery from confluent, but none of those were directed toward Dr. Wang or the hospital. And as a matter of fact- They were directed to other parties. In any event, the district court determined that they did not meet the standards of local rules. Is that right? Well, at least at the time that Judge Anderson rendered his decisions, there weren't any motions to compel pending. There wasn't any motion to continue the summary judgment motion pending. There wasn't any affidavit filed that detailed the need or detailed the reason why that confluent information would impact the result. Basically, no motion under Rule 56F stating we haven't had sufficient discovery to make it appropriate to decide whether summary judgment should be granted. Or perhaps more importantly, the way Judge Anderson referred to it is there wasn't any affidavit. Whether there was a motion or not, there certainly wasn't any affidavit from counsel. No motion to him under Federal Rule of Civil Procedure 56F, I think it was at the time, saying we need more discovery before this is right for decision on summary judgment. Correct. And really, the only additional comments I would have would be that this is actually a simple case. It isn't complicated. And there are a few certainties in life. I know there's some, is a parable the right word out there, death and taxes, but one of the certainties, if you will, of medical malpractice law is that with few exceptions, you're going to need an expert to talk about causation. And that was not present here at any time before Judge Anderson decided the summary judgment motion. Let me, what was the argument to the district judges to specifically what the malpractice was that caused the paralysis? Well, I know that there were, there was testimony from, let's see, I'm trying to think of whether it was Delamarder or, I know that Tauber certainly testified that the greater incidence of nonunion as a result of infection, but he specifically disclaimed that there would be no way that he would testify regarding whether there was any relation between Dr. Wang's conduct and the infection. Which witness was that? Dr. Tauber. And I guess I'm almost not able to think of what, because I think of breach of the standard of care and causation being hand in hand, and all I know is that there wasn't any expert who could put the two together, so there was no... Isn't that correct? That's correct. He just said that there is a greater rate of nonunion or pseudoarthritis when an infection occurs. Correct. And Ms. Moore's treating physician, Dr. Delamarder, was the same way. He talked about the sacrifice of a nerve root, but then said he couldn't determine whether that was as a result of the first surgery or Dr. Wang's surgery. Or he had no idea as to the cause of any of those things. So there was no expert testimony to establish causation. I think we have your point. Do you have anything else? Nothing further to add. All right. Other counsel need to argue? I have nothing further to add. All right. Thank you. Any questions? No. Thank you. You can use the rest of your time. Hold on. Start talking when you get up there. There's a mic. Well, I would like to point out that all of our experts were performing and testifying according to all the rules of medical ethics. If they didn't use the product, they didn't know what it was composed of, they couldn't testify that it caused an infection. If they weren't orthopedic surgeons, they couldn't say it affected the paralysis. And here you have cited in the minute order, Dr. Hawley says, Dursil didn't cause her, and I don't think he uses it. There's no foundation in his declaration saying he uses it. You also have, I think, the Meridia decision is really an important decision for us. She's a contraindication in the label. The Meridia decision says, if you have a contraindication or a warning, that is a presumption of causation. That's a presumption of causation. And here you have, and the judge is following what the appellees and the defendants did. They're citing the Jones case. The Jones case says, in a case involving a situation of cancer where the plaintiff died and the estate was substituted for her, they said in a lost chance causation case, you can't have raciopto, you can't have half. Then along, ten years later, you have Espinosa. Espinosa overrules half, overrules the Jones case as to that particular principle. And, in fact, Ms. Mosley, the Marquis partner, and Ryan Thetomia Mosley, actually argued or briefed that case. She's on, if you look at that. They knew. They knew that case was overruled. Did you say it was Meridia that? Meridia is the, Meridia, in re Meridia litigation. That is a diet substance. It's like methamphetamine. It's packaged and under a prescription. Did you say it creates a presumption of causation? Yes, it does. Yes, it does. Under the law of what state? Under the federal law. Well, it's from Ohio. It's from Ohio. But, it's from Ohio. And, they talk about not needing reasonable medical probability if you have a use of an FDA-approved substance against the label or the package insert. In re Meridia. And, there are some other cases in District Court, too. Is Meridia a case you cited in your brief? It is, Your Honor. It's M-E-R-I-D-I-A. It's still a drug that's being prescribed. It's very popular, very common. It's also given for, in lieu of Adderall. It's also given for ADD. So, if I could go through here just a little bit further. You know, Dr. Roman says that to a reasonable degree of medical probability. You don't need to go back over that. I think you're over time. We have it in your briefs. You've summarized the evidence. Okay? Yes, Your Honor. Thank you. Thank you for the argument, counsel. And we will be in recess. Case is submitted. All rise. This court is on recess until tomorrow morning at 9 a.m.
judges: Wolf, Hawkins, Fisher